IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| LATARSHIA LEE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. CV418-090 |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF WALTHOURVILLE, | ) | |
| | ) | |
| Defendant. | ) | |

<u>DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

Comes now the City of Walthourville (the "City"), Defendant herein, and in support of the Motion for Summary Judgment, shows to the Court as follows:

<u>FACTS</u>

Plaintiff Latarshia Lee claims that a FLSA action which she brought against the City for unpaid overtime, which case was settled, caused her job termination, and before that, caused the City to seek training for her to have RADAR and LIDAR training in her job as a police officer. Lee admitted in her deposition substantially all of the legitimate, non-discriminatory reasons the City provided for her job termination, and separately, for her during her employment to obtain job training in RADAR and LIDAR to fulfill the job duties of her job description.  Lee cannot show a desire by the City to retaliate against Lee because of her filing of a claim for overtime benefits under the FLSA, nor can Lee show that but-for the filing of her claim for overtime benefits under the FLSA, Lee would not have sustained adverse employment action. Lee cannot show a *prima facie* case for FLSA retaliation.  Assuming *arguendo* a *prima facie* case, the City has asserted legitimate, non-discriminatory facts underlying its acts pertinent to Lee, with which facts Lee almost entirely agrees.  Lee cannot show the City's reasons were pretextual.  There is

1

no direct evidence of retaliation, nor is there a convincing mosaic of discrimination.  Lee's suit must be dismissed.

Lee became employed with the City as a police officer on February 9, 2015.  *See* Depo. of Latarshia Lee taken Jan. 9, 2019, a copy of which is attached as Ex. 1, at p. 21.  This was her "first real police job."  *Id.*

2016 P.O.S.T. Suspension.  Lee admits that it was a job qualification throughout her employment that she be Georgia P.O.S.T. (Police Officer Standards and Training Council) certified.  *Id.* at 32-33.  She had to become familiar with Georgia law regarding employment and training of peace officers when she was in the police academy.  *Id.* at 27.  As a peace officer, she was required to complete training each calendar year.  *Id.* at 25.  She learned in the police academy that if she did not finish her training she would not have arrest authority.  *Id.* at 25, 46; *see also* O.C.G.A. § 35-8-21(a) and (d)("(a)  . . . [A]ny person employed or appointed as a peace officer shall complete 20 hours of training . . . (d)  Any peace officer who does not fulfill the training requirements of this Code section shall lose his or her power of arrest.. . .")

Lee admits that she acted as a police officer when her P.O.S.T. certification was suspended from Jan. 1, 2016 to Feb. 12, 2016, when she had no arrest authority or powers of a law enforcement officer generally.  *Id.* at 34, 36-38.  Her P.O.S.T. certification was suspended due to the fact that she did not complete her State mandated training.  *Id.* at 36.  She never reported her suspended status.  *Id.* at 38.  During that period she put her vehicle's blue light on and pulled people over, she exercised arrest authority to issue tickets, she signed traffic tickets on the line for signature of arresting officer, and she exercised law enforcement authority when she stopped people.  *Id.* at 46-48, 65, 69.  She never told the people she pulled over that she did not have arrest authority or general law enforcement power.  *Id.* at 47, 65.  She admits she

potentially exposed the City to liability for any potentially illegal arrests or stops. *Id.*, at 38. She thinks the City could have been liable for having someone out there issuing tickets without authority. *Id.* at 47. She may have issued fifteen or sixteen tickets during that time. *Id.* at 49. Lee admits that during this period she turned in time sheets for acting as a police officer, and she was paid for working 294 hours. *Id.* at 36-37, 44-45. In Feb. 2016 after notification by her supervisor, Sgt. Wright, and then-Police Chief Quarterman, Lee completed her training and paid a waiver fee to P.O.S.T. *Id.* at 45-46. She received a training waiver on February 12, 2016 per POST records, and her authority was restored. *Id.* at 34. Before her arrest powers came back in 2016, she did not have arrest powers. *Id.* at 43.

RADAR or LIDAR Certification. Lee admits that an essential function of a police officer job with the City is: "patrols to detect and deter criminal activity and traffic violations," and speeding is a type of traffic violation. *Id.* at 31-32. Lee admits that a job description for police officer for the City which applied during her employment included a duty to "monitor traffic to ensure motorists observe traffic regulations and exhibit safe driving procedures," which would include speed laws. *Id.* at 60-62, and Ex. 29 thereto. Lee admits that the job description which applied during her employment included, and it was a duty, to "issue citations or warnings to violators of motor vehicle ordinances," and it did not say just issue citations or warnings to violators of certain motor vehicle ordinances. *Id*. at 62. Lee admits that the job description for police officer for the City which applied during her employment included, "enforces vehicle parking and operating laws, uses RADAR and/or LIDAR unit to enforce speed laws, concentrating efforts on high accident locations." *Id*. at 60-63.

However, Lee admits she was not certified to detect and stop speeders, she could not enforce any moving violations having to do with speed, and she was not certified or authorized

to use RADAR or LIDAR to enforce speed laws.  *Id.* at 28, 32, 48, 63.  She admits that it is true

that persons employed or appointed by a municipality authorized to use speed detection devices

shall be required to be certified by P.O.S.T. as qualified speed detection device operators, that

prior to operating radar or laser equipment for the purpose of law enforcement action in Georgia,

a peace officer must acquire and maintain certification in the manner required by P.O.S.T., and

that should any person fail to complete successfully the training requirements for operation of

speed detection devices, he or she shall not perform any functions related to the use of the

devices until such training shall have been successfully completed and until such time as

P.O.S.T. shall issue appropriate certification.  *Id.* at 27-28; *see* O.C.G.A. § 35-8-12.  Lee admits

that RADAR and LIDAR are types of speed detection devices used to enforce speed limits in this

state, and without such certification she was not able to enforce the traffic laws regarding

speeding.  *Id.* at 28, 30.   Lee admits she failed the training for RADAR and LIDAR certification

at the police academy.  *Id.* at 29-30.  Lee admits she took the RADAR and LIDAR course when

she worked for the City so that she could enforce the type of traffic laws having to do with speed.

*Id.* at 48.  The City paid for her to take RADAR and LIDAR training, and she failed it.  *Id.* at 30.

She does not recall when she took the training when she was employed by the City.  *Id.*

     Lee Settled a Claim Under the FLSA with the City.  On July 20, 2017 Lee filed a

Complaint for Damages against the City in the Northern District of Georgia "seeking to vindicate

her rights to overtime compensation under the FLSA," which case was transferred to the

Southern District, *Latarshia Lee v. City of Walthourville*, U.S.D.C., So. Dist. of Ga., Case 1:17-

cv-2751.  *See* Complaint in this case, Doc. 1, at ¶ 13.  A settlement agreement was reached on

October 12, 2017.  *Id.*

<u>Subsequently, it Came to the City's Mayor's Attention Lee Was Still Not Certified to</u>
<u>Enforce Speeding Laws, and the Mayor Desired that Lee Have RADAR and LIDAR Training.</u>
In late 2017, the City police department had just five police officers.  See Depo. of Jerald
Burgess taken Jan. 2, 2019, attached as Ex. 2, at pp. 34-36.  Lee admits that the City is a small
city, and the absence of one officer seriously hampers the City's ability to protect the citizens
and property.  Lee Depo., Ex. 1, at 53.

One day at the City's municipal court, officers were going up giving testimony about
making a RADAR stop.  Burgess Depo., Ex. 2, at 66.  Lee would come up and say, "Stop sign,
stop sign."  *Id.*  After court, Mayor Daisy Pray asked now-Interim Police Chief Burgess, "I see
Lee is only doing stop sign [cases], why does she only do stop sign [cases]?"  *Id.*  Burgess told
her, "Well, she's not certified to do RADAR or LIDAR."  *Id.*  Burgess cannot say what day this
conversation occurred.  *Id.*  However, he thinks Lee's overtime complaint was around December,
2017, and when he and the Mayor had the discussion about Lee's lack of RADAR and LIDAR
certification was before December, 2017.  *Id.*, at 66-68.  Per Burgess, the discussion he had with
Mayor Pray about Lee's lack of RADAR and LIDAR certification had nothing to do with Lee's
overtime complaint.  *Id.* at 68.

Per Mayor Pray, though it does not disqualify an officer without RADAR or LIDAR
certification from being hired, being a small police department, she would like for all of their
officers to be trained with everything.  *See* Depo. of Mayor Daisy Pray taken Jan. 2, 2019,
attached as Ex. 3, at 75-76.  Mayor Pray is the CEO of the City, including being over personnel,
and everything would come before her.  *Id.*, at 8-9.  Lee was hired without RADAR certification,
but when the officer gets hired Mayor Pray expects the officer to go get their training.  *Id.* at 87.
Being a small police department you need everyone to be able to do everything, so in case one is

out the other one can go out there.  *Id.* at 75, 82-83.  Per Mayor Pray, everyone in the police department should be trained and cross-trained to do everything, because you never know when someone might call in sick and they are left without an officer to run RADAR.  *Id.* at 87-88. Mayor Pray recalls the conversation with Burgess about Lee's lack of RADAR or LIDAR certification pretty similarly to the way Burgess recalls it, and asking Burgess why Lee was not RADAR certified and Burgess telling her that Lee failed it.  *Id.* at 105.

Mayor Pray requested Lee's P.O.S.T. certification records on October 19, 2017, to see what P.O.S.T. had on Lee as far as getting Lee trained.  *Id.* at 102-103.  In response to an Oct. 27, 2017 reprimand to then-Police Chief Quarterman, Quarterman agreed to provide a training schedule for Lee with the goal of having Lee trained and certified to operate RADAR and LIDAR.  *Id.* at 108-110.   Mayor Pray believes she learned of Lee still lacking RADAR and LIDAR certification between the October 27, 2017 reprimand to then-Chief Quarterman, and a prior disciplinary action to Quarterman dated October 15, 2017 in which the RADAR and LIDAR training for Lee was not mentioned.  *Id.* at 81, and Exhs. 12 and 13 thereto.  Mayor Pray was not putting pressure on Quarterman to terminate Lee, Mayor Pray wanted Lee to get certified for RADAR "and everything that she needs to be a police officer in the City of Walthourville.. . . When you have a small department, like I stated before, when someone's out and she couldn't run RADAR, who would be out there getting the speeders? . . . [Y]ou never know when someone might call in sick, call out sick and we're left without an officer to run RADAR."  *Id.* at 86-88.

On Dec. 8, 2017, Lee filed a Charge of Discrimination with the EEOC claiming retaliation starting Nov. of 2017, when she was allegedly "subjected to harassment, intimidation and unequal terms and conditions by Jeff Arnold, City Attorney, Melissa Jones, Human

Resources and Daisy Pray, Mayor." *See* Depo. of Melissa Jones taken Jan. 3, 2019, Ex. 5., at pp. 41-44, and Ex. 25 thereto. Lee claimed in the Charge, "I believe the city is trying to force me to quit." *Id.* The day before, on Dec. 7, 2017, Lee had filed an internal complaint that she felt she was a target and that she was being demanded to attend specialized training by the City when this is not her choice and she didn't need it in her job. *Id.* at 33-35.

        <u>Discovery by the Mayor and Jones of the 2016 Suspension</u>. In Oct. of 2017, Chanda Taylor had started employment with the City as municipal court clerk, the sole clerk for the municipal court. *See* Depo. of Chanda Taylor taken Jan. 3, 2019, attached as Ex. 4, at pp. 5, 12, 17. At some point after starting, Taylor discovered in a filing cabinet, while getting familiarized with its contents, a suspension order from P.O.S.T. regarding Lee dated February 3, 2016. *Id.* at 14-15, 18, and Ex. X-5. Taylor read it and knew what it was because Taylor had previously been P.O.S.T. certified. *Id.* at 30. Taylor also saw in that filing cabinet, related to Lee, a complaint where Lee was being sued about bills. *Id.* at 21-22. Per Taylor, the documents did not belong in that filing cabinet. *Id.*, at 33. After showing the P.O.S.T. suspension order to then-Police Chief Quarterman, Taylor turned over the suspension order and suit documents to Melissa Jones in HR. *Id.* at 22, 31-32. At the time Taylor found these documents Taylor was not aware that Lee had filed an overtime complaint against the City, or that Lee had filed an EEOC Charge against the City, or that Lee had filed a complaint alleging retaliation internally against the City. *Id.* at 22-23. Taylor had never spoken with Jones or Mayor Pray about Lee. *Id.* at 23.

        Melissa Jones became HR Administrator with the City on April 10, 2017. Jones Depo., Ex. 5, at 16, 23 and 24. Jones recalls receiving Lee's 2016 P.O.S.T. suspension order from Taylor, and Taylor indicating the P.O.S.T. suspension order needed to be in human resources and not at the police department. *Id.* at 26-27. Mayor Pray found out about Lee's 2016 suspension

from Jones, who indicated to Mayor Pray that Jones found out about the suspension from the suspension letter found at the back of a filing cabinet at the Police Department.  Pray Depo., Ex. 3, at 155-156.  Lee's 2016 P.O.S.T suspension became known to Mayor Pray on December 26, 2017.  *Id.* at 116.

An "Amendment" to a disciplinary action against Quarterman dated Dec. 27, 2017 referenced the City's discovery that Lee had lost P.O.S.T. certification in 2016, Quarterman had been provided written notice of suspension on or about Feb. 3, 2016,  and Quarterman continued to let Lee work without powers of arrest and inability to perform the duties of her employment, all the while getting paid and potentially opening up the City to liability for any potentially illegal arrests or stops she may have made during this period.  Ex. 10 to Mayor Pray Depo., Ex. 3, at p. 2.

In 2018 Lee Lost P.O.S.T. Certification, Again, and the City Terminated Her Employment.  Lee again lost her arrest authority again because of a training deficiency on January 1, 2018.  Lee Depo., Ex. 1, at 35.  Lee's last day of employment with the City was January 22, 2018.  *Id.*  On January 22, 2018, Lee did not have P.O.S.T. certification.  *Id.*  From January 1, 2018 through at least January 22, 2018, she lacked arrest authority.  *Id.*, at 35-36.  No one had to tell Lee that without paying a waiver fee after finishing the training in 2018 that she could not exercise arrest powers, she knew that.  *Id.* at 42.

Jones received a letter from Jeff Miller, Director, Certification & Training Standards, P.O.S.T., dated January 10, 2018, regarding Lee's lack of P.O.S.T. certification in 2016 and in 2018:

> Per our recent phone conversation, please accept the following as documentation for the status of Latarchia Lee's peace officer certification.
>
> Due to a training deficiency in 2015, Ms. Lee had no arrest authority as a peace

> officer from January 1, 2016 to February 12, 2016.  That matter was cleared up
> with a training waiver on February 12, 2016, per POST records, and her authority
> was restored.  Now, due to a training deficiency in 2017, Ms. Lee has no arrest
> authority as of January 1, 2017.  This will remain the case until she, again, clears
> the issue with a training waiver.

*See* Ex. 5 to Lee Depo.,Ex. 1, at City076 therein.

By letter dated January 12, 2018 Melissa Jones sent to Lee, and Lee received, a letter

titled "Proposed Adverse Action."  Lee Depo., Ex. 1, at 49, and at Ex. 5 thereto, at pp. City079-

City080.  The pertinent parts of the letter, and Lee's admissions at her deposition regarding

same, follow:

> This is a notice of proposed adverse action issued in order to give you the
> opportunity to review the charges against you and submit a response if you desire.
> In order to promote the efficiency of the City of Walthourville Police Department
> and maintain discipline, it has been proposed to remove you from your position
> with the City of Walthourville Department on January 19, 2018.
>
> This proposed adverse action is based on the following allegations:
>
> On January 10, 2018, the Georgia Peace Officer Standards and Training Council
> informed the City that you currently have no arrest authority as a police officer
> within the State of Georgia as of January 1, 2018.  The City has no documentation
> where you yourself let us know of your inability to work the job for which you
> were hired.

Lee has no reason to doubt any part of the last paragraph, above. *Id.* at 50.

> You have a history of being deficient in your training.  Allegedly, you were
> without law enforcement powers from January 1, 2016 to February 12, 2016 due
> to a training deficiency.  Despite having no law enforcement powers during this
> period, you continued to work, make arrests, and receive pay from the City of
> Walthourville.

Lee admits that all of the above paragraph is true.  *Id.* at 51.

> Further, our records indicate that [you] were provided written notice of an
> emergency suspension from POST on or about February 3, 2016.
> Notwithstanding receiving actual notice of the suspension of your law
> enforcement powers, you logged 96 hours for the pay period between 2/3/16 and
> 2/16/16.  Pursuant to OCGA 35-8-21(d) and (g), you would have been without
> powers of arrest and have been unable to perform your duties as an officer of the

> City of Walthourville.  Working during this period potentially exposed the City to
> liability for any potentially illegal arrests or stops you may have made during this
> period.

As to the first sentence of the above paragraph, Lee does not recall being provided written notice

of the 2016 suspension on or about February 3, 2016.  *Id.* at 51.  However, she does not disagree

with any part of the remainder of the above paragraph, starting with the second sentence,

"Notwithstanding . . ."  *Id.* at 51-52.

> You allegedly did not inform anyone within the City of your suspension in 2016,
> and did not do so with the most recent suspension.  We are a small city; the
> absence of one officer seriously hampers our ability to protect the citizens and
> property.  We are also unable to plan and schedule officers to cover shifts without
> accurate, correct, and truthful knowledge of an officer's ability to perform their
> duties.

As to the first sentence, above, Lee agreed she never reported her 2016 suspended status.  *Id.* at

p. 38.  She claims that she notified former Police Chief Quarterman and Sgt. Wright of her 2018

suspension, but she does not recall when she told them.  *Id.* at pp. 52-53.  She agrees with the

rest of the paragraph, starting with the beginning of the second sentence.  *Id.* at p. 53.

The remainder of Jones' January 12, 2018 letter to Lee, among other things, informed

Lee of Lee's right through January 19, 2018 to answer the letter or to request an oral conference,

and that consideration would be given to extending the time if Lee submitted a written request

within that time frame.  *Id.* at Ex. 5 thereto, at City080.  The letter indicated Lee would be

retained in a suspended, unpaid status in her current capacity through January 19, 2018.  *Id.*

Lee did not report to work, and Jones was trying to get clarity on Lee's sick leave.  Jones

Depo., Ex. 5 at 79.  Lee had furnished doctor's excuses for December 28, 29 and 30, relating to

medical treatment on December 28, 2018.  Lee Depo., Ex. 1, at 55-56, and Ex. 29 thereto, at pp.

4, 6.  Jones could not get in contact with Lee.  Jones Depo., Ex. 5, at 79.  On January 17, 2018,

Jones sent Lee an email seeking that Lee submit a doctor's excuse for December 31, 2017.  Lee

10

Depo., Ex. 1, at 55-56, and Ex. 29 thereto, at pp. 4, 6.  Jones' email stated, in pertinent part:  ". . .
You submitted several doctor excuses; however, I do not have one for December 31st.  Will you
submit that so we can prepare payroll?  Your payroll check will be printed and available for you
to pick up once I receive the doctor note for December 31st.  If you do not have an excuse for that
day, please let me know.. . ."  *Id.*  Lee then submitted a doctor's excuse for December 31, 2018
to the City.  *Id.*  It was the same excuse Lee had submitted for December 28-30, for treatment
(allegedly) furnished on December 28, but it had added on it another day, December 31.  *Id.* at
57.  Lee admits the excuse had "void, void, void, void" all over it, unlike the excuse she had
earlier provided for December 28-30.  *Id.* at 56-57.  Jones sent Lee an email asking Lee if Jones
could call the medical provider to ask about the excuse for December 31, and per Lee, ". . . I
knew from right then that it was fixing to be a difficult situation."  *Id.* at 58.  Lee did not give
permission to Jones to confirm the excuse with the provider.  *Id.* at 58-59.

On January 22, 2018 Lee sent Jones an email in which, *inter alia*, Lee admitted her
P.O.S.T. certification was suspended.  Lee Depo., Ex. 1, p. 41, and Ex. X-5 thereto, at p. 7,
City077.

> Mrs. Jones
>
> I have been under medical since December 26th 2017.  I have not conducted any
> law enforcement duties since this date.  During this time I was short (2) hours my
> annual training and did not complete it by 31st December 2017 which placed me
> in a suspended status until the (2) hours are completed and the waiver fee is paid.
> This is a normal procedure that POST has put in place for officers who do not
> meet their training due to different circumstances.
>
> I have now completed the (2) training and in the process of paying the waver fee.
> Maam I am still under medical.  I will pay the waiver and inform you before my
> return to work.  I asked about my pay earlier but did not get a response.  Can you
> inform me if I will be paid or not.  The last few month has been really work
> related stress with the issue you seem to involve me in particularly.  I don't feel
> that the threat to my employment is necessary for something that is being
> corrected by me.  I ask for this pressure to stop.

Thank You

Officer L. Lee.

Lee Depo., Ex. 1, p. 41, and Ex. X-5 thereto, at p. 7, City077.

In Lee's termination letter dated Jan. 22, 2018, the listed grounds for decision are the same as were in the January 12, 2018 Proposed Adverse Action letter of Lee, with one addition:

> Finally, in an effort to explain away your deficiency, you apparently altered a doctor's note from the Lexington Medical Center.  We asked you to provide some form of supporting documentation to clear up the apparent altered notes, but none was forthcoming.  Please note, that we did not inquire as to the nature of your condition, just the written excuse for the absence(a).

*Id.*, at 59-60, and Ex. 5 to Lee Depo. at City081-083.  In response to the above paragraph, Lee admits that the City asked her to provide some form of supporting documentation, and none was forthcoming.  *Id.*

Per Mayor Pray, Lee losing her P.O.S.T. certification in Jan. of 2018 would independently be grounds for termination because Lee was not a police officer, she couldn't arrest.  Pray Depo., Ex. 3, at 160-161.  Per Mayor Pray, the 2016 suspension happened again, and it was a repeated thing Lee was doing,  *Id*, at 162.  Jones does not think there is anything that the City did wrong in dismissing Lee.  Jones Depo., Ex. 5, at 120.  Mayor Pray makes the decision to terminate.  Pray Depo., Ex. 3, at 10.  Mayor Pray believes the City acted properly with respect to Lee.  *Id.* at 174.

Lee filed her Complaint for Damages in this case on April 20, 2018, claiming that after settlement of the FLSA action on October 12, 2017, the City and Mayor Pray began to subject Lee to increasing scrutiny, including directing and pressuring Lee's superiors to target Lee for termination, and not paying Lee for sick time causing her to be terminated, in retaliation for her filing a claim under the FLSA.  Doc. 1.  Lee's claims are without merit.

<u>ARGUMENT AND CITATION OF AUTHORITY</u>

I.      <u>The FLSA Retaliation Claim Must be Dismissed.</u>

25 U.S.C.§ 215(a)(3) of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, makes it

unlawful, in relevant part, for any person "to discharge or in any other manner discriminate

against any employee because such employee has filed any complaint or instituted or caused to

be instituted any proceeding under or related to this chapter . . ."  With regard to discrimination

actions generally, "In order to survive summary judgment, a plaintiff alleging intentional

discrimination must present sufficient facts to permit a jury to rule in her favor.  One way that

she can do so is by satisfying the burden-shifting framework set out in *McDonnell Douglas*

*[McDonnell Douglas Corp. v.* Green, 411 U.S. 792, 800 (1973).]"  *Jacqueline Lewis v. City of*

*Union City,* __ F.3d __, Slip Op. at 9 (11th Cir. 3/21/19).  "A plaintiff can also present direct

evidence of discriminatory intent, *see, e.g., Jefferson v. Sewon America., Inc.,* 891 F.3d 911, 921-

22 (11th Cir. 2018), or demonstrate a 'convincing mosaic' of circumstantial evidence that

warrants an inference of intentional discrimination, *see, e.g., Smith v. Lockheed-Martin Corp.*,

644 F.3d 1321, 1328 (11th Cir. 2011)(citation and quotation marks omitted)."  *Id.* at fn 6.  In this

case the City did not retaliate or discriminate against Lee because she asserted rights under the

FLSA.  Lee's suit must be dismissed.

A.      <u>There is No Direct Evidence of Retaliation.</u>

There is no direct evidence of retaliation or discrimination.

Direct evidence 'reflects 'a discriminatory or retaliatory attitude correlating to the
discrimination or retaliation complained of by the employee.'"  *Wilson v. B/E*
*Aerospace, Inc.,* 376 F.3d 1079, 1086 (11th Cir. 2004) (quoting *Damon v.*
*Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1358 (11th Cir. 1999)
(internal quotation marks omitted).  If believed, direct evidence "proves [the]
existence of [a] fact without inference or presumption." *Id.* (quoting *Burrell v. Bd.*
*of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997)).  For that
reason, " 'only the most blatant remarks, whose intent could mean nothing other

than to discriminate on the basis of' some impermissible factor constitute direct
evidence of discrimination." *Id.* (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 n.
2 (11th Cir. 2002)).

*Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1270 (11th Cir. 2017).  There

is no alleged direct evidence to support a claim of retaliation under the FLSA.

B.    Lee Cannot Establish a Circumstantial Case of Retaliation.

1.    Lee Cannot Establish a *Prima Facie* Case of Retaliation.

A prima facie case of FLSA retaliation requires a demonstration by the plaintiff of
the following:  '(1) she engaged in activity protected under [the] act;  (2) she
subsequently suffered adverse action by the employer; and (3) a causal connection
existed between the employee's activity and the adverse action.'  *Richmond v.
ONEOK, Inc.*, 120 F.3d 205, 208-09 (10th Cir. 1997).  If the employer asserts a
legitimate reason for the adverse action, the plaintiff may attempt to show pretext.
*See id.*  In demonstrating causation, the plaintiff must prove that the adverse
action would not have been taken 'but for' the assertion of FLSA rights.  *See
Reich v. Davis*, 50 F.3d 962, 965-66 (11th Cir. 1995).

*Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342-1343 (11th Cir. 2000).

On July 20, 2017 Lee filed her underlying Complaint against the City seeking overtime

pay under the FLSA.  *See* reference in current Complaint, Doc. 1, at ¶ 13.  Lee's last day of

employment with the City was January 22, 2018.  Lee Depo., Ex. 1, at 35.  Though these facts go

toward establishing elements (1) and (2) of a *prima facie* case, Lee cannot show element (3), a

causal connection between Lee's activity and an adverse action, with proof that the adverse

action would not have been taken but for the assertion of FLSA rights.  "Lest we forget, the

plaintiff's burden at step one [the *prima facie* case part of an analysis per *McDonnell Douglas

Corp. v. Green*, 411 U.S. 792 (1973)] is to show a *prima facie* case of something in particular –

namely, unlawful, intentional 'discrimination.'"  *Jacqueline Lewis v. City of Union City, Ga.*, __

F.3d __, Slip Op. at 12-13 (11th Cir. 3/21/19)(per curiam).

1.      <u>There is Insufficient Temporal Proximity to Support Causation.</u>

The six months between the filing of the underlying Complaint asserting claims under the FLSA on July 20, 2017 and employment termination on January 22, 2018 is not the close temporal proximity to establish causation as part of a *prima facie* case of causation.  Lee may "ask[s] this Court to consider the brief amount of time between the settlement [of her claim for overtime under the FLSA] and her discharge . . . but we begin our calculation on the date the employer gains 'knowledge of the protected expression.'  *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004). . ."  *Raspanti v. Four Amigos Travel*, 266 Fed. Appx. 820, 823 (11th Cir. 2008) (unpublished).

> The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action.  *See Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 798-799 (11th Cir. 2000).  But mere temporal proximity, without more, must be 'very close.'  *Clark Co. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001)(internal citations omitted).  A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough.  *See id.* (citing *Richmond v. ONEOK*, 120 F.3d 205, 209 (10th Cir. 1997)(3 month period insufficient) and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992)(4 month period insufficient)).  Thus, in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a mater of law.  *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004)(citing *Wascura v. City of South Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001)).

*Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)(per curiam).

The six month delay between July 20, 2017 and the alleged adverse action of termination on January 22, 2017, with no other evidence tending to show causation, results in Lee's complaint of retaliation failing as a matter of law.

There is no other act which can be claimed to be an adverse employment act. "[T]he inquiry is whether an employer's actions likely would have 'dissuaded a reasonable worker from making or supporting a charge' against the employer.  *Burlington N. & Santa Fe Ry. Co. v.*

*White*, 548 U.S. 53, 68 (2006) . . . "'  *Smith v. Haynes & Haynes, P.C.*, 2017 WL 3613045, *7

(N.D.Ala. 2017).  Providing an employee training they need to fulfill what they agree to be the

essential duties of their employment is only beneficial to the employee, and is not an adverse

employment action.

2.    <u>Lee's Loss of P.O.S.T. Certification Severed All Causation.</u>

Lee's loss of P.O.S.T. certification on January 1, 2018 caused by her own failure to fulfill

training requirements severed any connection and any causation chain between any protected

acts and her employment termination.

> Intervening employee misconduct 'break[s] the causal link between the protected
> conduct and the adverse employment action.'  *Henderson v. FedEx Express*, No.
> 10-15633, 2011 WL 4600721, at *4 (11th Cir. 2011)(per curiam)(unpublished
> opinion)(affirming grant of summary judgment); *see also Kiel v. Select Artificials,
> Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999)(en banc)(affirming grant of summary
> judgment and explaining that plaintiff's intervening misconduct 'eroded any
> causal connection that was suggested by the temporal proximity of his protected
> conduct and his termination');  *Schoebel v. Am. Integrity Ins. Co. of Fla.*, No.
> 8:14-CV-426-T-27AEP, 2015 WL 4231670, at *3 (M.D.Fla. July 10,
> 2015)(granting summary judgment in part).

*Brown v. Ga. Dept. of Human Svcs. Div. of Family and Children Svcs.,* 2016 WL 6647940, *16

(S.D.Ga. 2016).  Lee's suit must be dismissed for failure to establish the causation element to a

*prima facie* case.  *See Hankins v. AirTran* Airways, 237 Fed.Appx. 513 (11th Cir. 2007)

(unpublished)(Five days after Hankins reported suspected race bias, Hankins yelled at a co-

worker for cutting her off in line and stated that she would "kick his ass if he ever tried to cut in

front of [her] again in line";  Hankins' act of misconduct severed the causal connection (if any)

between her initial complaint of discrimination and the employer's decision to terminate her

employment); *Wang v. Florida Atl. Univ. Bd. of Trustees*, 2018 WL 3241359, *16 (S.D.Fl.

2018)(At bottom, the record demonstrates that the University believed that Plaintiff had

'admitted to sending the email' containing discriminatory comments about another employee . . .

16

Plaintiff's admission is sufficient to establish a foundation for Defendant's honest belief that Plaintiff sent the discriminatory e-mail and was subject to suspension. *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989) ('Admission of misconduct provides sufficient foundation for an employer's good faith belief that an employee has engaged in misconduct.')); *Sifuentes v. Nat'l Beef Packing Co.,* 2014 WL 4079933, *11 (M.D.Ga. 2014)("[T]here is no requirement that an employer who learns of a work rule violation must 'refrain from taking investigative and disciplinary action merely because the employee also recently engaged in protected conduct.")

It should also be pointed out that in the very recent Eleventh Circuit Court of Appeals published decision of *Jacqueline Lewis v. City of Union City, Ga.*, __ F.3d __, Slip Op. at 12-13 (11th Cir. 3/21/19)(per curiam), the Court held "that a plaintiff proceeding under *McDonnell Douglas* must show that she and her comparators are 'similarly situated in all material respects.'" *Id.* at 23.  At fn 11 of that opinion, the Court added, "To be clear, the 'similarly situated in all material respects' standard that we embrace today applies to all discrimination claims pursued under *McDonnell Douglas*."  "All" would include cases asserting a claim of retaliation under the FLSA.  Lee cannot show any comparator "similarly situated in all material respects."  This is an independent reason for Lee's claim being dismissed on summary judgment.

3.　　Assuming *Arguendo* a *Prima Facie* Case of Retaliation, the City had Legitimate, Non-Discriminatory Reasons for its Actions.

Lee needed P.O.S.T. certification to be able to act as a police officer, she did not have it after January 1, 2018, she had previously in 2016 lost P.O.S.T. certification and acted as a police officer without P.O.S.T. certification without telling anyone until encountered by then-Chief Quarterman and Sgt. Wright, and the City was within its rights to let Lee go for reasonable, meritorious reasons which were stated in the Proposed Adverse Action and Termination letters, the truth of which reasons, and the reasonableness of same, were admitted to and not disproven

17

by Lee.  Assuming *arguendo* (which is denied) that Lee asserts a *prima facie* case of retaliation,

the City had abundant legitimate, non-discriminatory reasons for its actions.  "'If the defendant

carries this burden of production, the presumption raised by the prima facie case is rebutted,'

*Burdine* [*Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)], and 'drops from

the case,' *id.* at 255 n. 10.. . ."  *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009).

### 4.   Lee Cannot Show Pretext.

> To show pretext, [plaintiff] must 'present concrete evidence in the form of
> specific facts which showed that the defendant's proffered reason was mere
> pretext.  Mere conclusory allegations and assertions would not suffice.' *Bryant v.*
> *Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009)(quoting *Earley v. Champion Int'l*
> *Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)(alterations omitted)).  To prove
> pretext, the plaintiff must show that the employer's proffered reason was false,
> and that retaliation was the real reason.  *Hornsby-Culpepper v. Ware*, 906 F.3d
> 1302, 1312 (11th Cir. 2018).  The plaintiff must rebut the reason 'head on,' which
> means something more than merely quarrelling with the wisdom of that decision.
> *Id.*  'At the summary judgment stage, the district court must evaluate whether the
> plaintiff has demonstrated such weaknesses, implausibilities, incoherencies, or
> contradictions in the employer's proffered legitimate reasons for its action that a
> reasonable factfinder could find them unworthy of credence.'  *Id.* (quotation
> marks and alterations omitted.

*Brathwaite v. School Bd. of Broward Co., Fl.*, __ Fed.Appx. __, 2019 WL 9923270, *5 (11th Cir.

2019)(unpublished).

> [T]he fact that Plaintiff may have personally viewed the training requirement as
> unnecessary is irrelevant to the issue of whether the reasons given by his
> employer were not the real reasons for the termination decision.  'The inquiry into
> pretext centers on the employer's beliefs, not the employee's beliefs and, to be
> blunt about it, not on reality as it exists outside of the decision maker's head.'
> *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).
> 'Indeed, an employer can hardly be said to have discriminated or retaliated
> against an employee if it terminated the employee based on a good faith belief
> that she violated a rule, even if the purported violation never actually occurred.'
> *Feise v. N. Broward Hosp. Dist.*, 683 Fed.Appx. 746, 753 (11th Cit. 2017).

*Wang v. Florida Atlantic Univ. Bd. of Trustees*, 2018 WL 3241359 (S.D.Fl. 2018).

> That Lee may assert that the but-for reason for her employment termination was

discrimination rather than the suspension of her P.O.S.T. certification for the second time, under the circumstances which Lee admits, shows Lee cannot demonstrate prextext.  Lee also admits the additional factual allegation in her termination letter, that Lee would not explain an apparently void and altered medical excuse.  That Lee might argue that she should have been given more time to obtain a waiver from P.O.S.T. to obtain back from suspension her P.O.S.T certification, and that termination was too harsh a punishment, is not a legal argument because Lee is seeking to replace the City's judgment with her own.

> [T]he FLSA does not require 'good' behavior on the part of an employer. Additionally, federal law does not guarantee employees a stress-free working environment.  *See Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1233-34(11th Cir. 2001).  'We are not a "super-personnel department' assessing the prudence of routine employment decisions, "no matter how medieval," "high-handed," or "mistaken."'  *Flowers v. Troup Cty., Ga., Sch. Dist., 803 F.3d 1327, 1337-38 (11th Cir. 2015), cert. denied sub nom., Flowers v. Troup Cty., Georgia, Sch. Dist., __ U.S. __, 136 S.Ct. 2510, 195 Led.2d 840 (2016)(*quoting *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010)).  Indeed, as we have held in similar contexts, 'employers may terminate an employee for a good or bad reason without violating federal law.'  *Id.* at 1338 (quotation omitted).  Thus, to succeed plaintiffs must demonstrate that they suffered an adverse employment action because they engaged in activity protected under the FLSA.

*Perez v. Anastasia M. Garcia, P.A.*, 701 Fed. Appx. 938, 940-941 (11th Cir. 2017)(per curiam).

    C.    <u>There is No Convincing Mosaic of Retaliation.</u>

Lee cannot show "but-for" causation, that had she not filed the Complaint seeking overtime pay under the FLSA, there would not have been an adverse action taken against her. At her deposition in this case, she admitted almost every substantive part of the Proposed Adverse Action letter of January 12, 2018, and the termination letter of January 22, 2018.  She did not respond to the Proposed Adverse Action letter of January 12, 2018 timely or with a request for an oral hearing.  It is uncontroverted that the City set out good and non-discriminatory reasons for termination in the January 12, 2018 and January 22, 2018 letters.

There is no showing that Lee was treated differently by Mayor Pray than anyone else "similarly situated in all material respects."  Lee cannot show any "convincing mosaic" of discrimination or retaliation that would otherwise allow her claims to withstand summary judgment.  Retaliation for filing a claim for overtime under the FLSA was not the but-for reason for any adverse employment action.   Lee's suit must be dismissed.

WHEREFORE, the City of Walthourville respectfully requests that Plaintiff Latarshia Lee's Complaint be dismissed, with all costs cast against the Plaintiff.

This _27th_ day of March, 2019.

OLIVER MANER LLP

_/s/ Patrick T. O'Connor_
PATRICK T. O'CONNOR
Georgia Bar No. 548425

218 W. State Street
P. O. Box 10186
Savannah, Georgia  31412
pto@olivermaner.com
ppaul@olivermaner.com

_/s/ Patricia T. Paul_
PATRICIA T. PAUL
Georgia Bar No. 697845

ARNOLD & STAFFORD

_/s/ Andrew S. Johnson_
ANDREW S. JOHNSON
Georgia Bar No. 107116
City Attorney

218 S. Main Street
Hinesville, Georgia  31313
(912) 289-0673
ajohnson@coastallawyers.com

Attorneys for Defendant
City of Walthourville

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have on this day served all the parties in this case in accordance with the directives from the Court Notice of Electronic Filing ("NEF") which was generated as a result of electronic filing.

This <u>*27th*</u> day of March, 2019.

OLIVER MANER LLP

*/s/ Patricia T. Paul*
PATRICIA T. PAUL
Georgia State Bar No. 697845

218 W. State Street                                 Attorneys for Defendant
P. O. Box 10186                                     City of Walthourville
Savannah, Georgia  31412
(912) 236-3311
ppaul@olivermaner.com