# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

LATARSHIA LEE,

        Plaintiff,

    v.

CITY OF WALTHOURVILLE,

        Defendant.

CIVIL ACTION NO.: 4:18-cv-90

## O R D E R

Presently before the Court is Defendant City of Walthourville's (the "City") Motion for Summary Judgment. (Doc. 27.) This action concerns the City's decision to terminate Plaintiff Latarshia Lee's employment in January 2018. (Doc. 1.) Plaintiff seeks damages for alleged violations of her rights under the Fair Labor Standards Act of 1938, § 28 U.S.C. 201, *et seq.* ("FLSA"), arguing that the City violated the FLSA by engaging in unlawful workplace retaliation after the parties settled a separate lawsuit in late 2017. (Id.) The City has filed the at-issue Motion for Summary Judgment, (doc. 27), to which Plaintiff filed a Response, (doc. 31), Defendant filed a Reply, (doc. 34), and Plaintiff filed a Surreply, (doc. 36). As explained below, the Court finds that Plaintiff has not presented enough evidence to permit a reasonable jury to find that the City unlawfully retaliated against her. Thus, the Court **GRANTS** the City's Motion for Summary Judgment. (Doc. 27.) The Court **DIRECTS** the Clerk of Court to enter summary judgment in favor of the City and to **CLOSE** this case.

# BACKGROUND

Plaintiff Lee worked as a police officer[1] for the City from February 9, 2015 until her termination on January 22, 2018. (Doc. 27-2, pp. 1, 12.) In July 2017, Plaintiff filed a separate FLSA lawsuit against the City for unpaid overtime wages. (Id. at p. 4.) The parties reached a settlement in October 2017. (Id.) In January 2018, the City suspended Plaintiff after she lost her arrest authority due to a training deficiency and ultimately terminated her employment on January 22, 2018. (Id. at pp. 3–4, 33; doc. 27-3, p. 39.) The crux of Plaintiff's claim is that, in retaliation for the initial lawsuit, the City scrutinized her employment record until it found a seemingly legitimate reason to terminate her. (See Doc. 31, pp. 2–3.) The relevant details are discussed below.

## I. Details Surrounding Plaintiff's Position with the City

### A. City of Walthourville Personnel and Operating Procedures

The City of Walthourville is a "small" city in Georgia. (Doc. 31-1, p. 14.) Daisy Pray was the City's mayor at all times relevant to this action. (Doc. 27-5, p. 3.) As mayor, Pray was the decisionmaker for employment-related issues, meaning she had the final say as to what level of discipline was appropriate for any issues that arose with City personnel. (Id. at pp. 3–4; doc. 31-1, p. 45.) In her deposition, Pray testified that she relied on information provided by the City's human resources administrator to make these decisions. (Doc. 27-5, p. 4.) The City had two different human resources administrators during Plaintiff's three-year tenure—Shana Moss, who left in February 2017, (id., p. 32), and Melissa Jones, who started in April 2017 and held the position when the City terminated Plaintiff, (doc. 31-1, pp. 28, 37). When she was administrator, Jones would present Pray with the "investigatory information" about the at-issue employee and a

---

[1] In the parties' briefs, the terms "peace officer" and "police officer" are used interchangeably to describe her position with the City. (See, e.g., Doc. 31-1, p. 1; doc. 31, p. 8.)

recommendation as to whether she felt termination was the proper course of action. (Doc. 27-5, p. 4.) Pray explained that she would consider the information provided, the underlying facts, and Jones' recommendation. (Id. at pp. 4–5.)

According to Pray, she also considers the disciplinary policy outlined in the City's personnel manual prior to making a final decision. (Id.) The manual distinguishes between "major" and "minor" disciplinary procedures; oral reprimand, formal written reprimand, probation, and suspension without pay for up to five working days are listed as "minor" procedures, while probation, suspension without pay for up to six weeks, pay reduction, demotion, and dismissal are listed under the "major" subheading. (Id. at p. 9.) The type of discipline appropriate in each situation "depends on the infraction itself." (Doc. 32, p. 115.) For example, the City considers whether the infraction puts the City at risk for liability and whether the employee can continue to successfully perform his or her duties. (Id. at p. 119.) The manual also sets forth a progressive disciplinary policy, meaning the levels or "[d]egrees of discipline are generally progressive and are used to ensure that the employee has the opportunity to correct or improve his or her job performance." (Doc. 31-11, p. 10; doc. 27-5, p. 8.) However, the policy further provides that the City "may depart from progressive discipline and skip any step or steps of the disciplinary process after investigation and analysis of the situation and circumstances." (Doc. 31-11, pp. 10, 12.) Otherwise, "a regular employee may be terminated for disciplinary reasons, or as the final step in an accumulation of infractions, from City employment by the department director, Human Resources Administrator, or Mayor." (Id. at p. 12.) If termination is deemed the appropriate course of action, the manual provides that the City will issue a letter that "detail[s] the effective cause and [the] date of discharge." (Id.)

The City's police department is led by the Chief of Police who is responsible for the day-to-day operations and the training of the officers. (Doc. 27-5, pp. 3, 10; doc. 27-4, pp. 4–5.) Bernie Quarterman was the Chief for the majority of Plaintiff's employment with the City, serving from 2015 until January 10, 2018, when he was terminated (several days before Plaintiff's own termination). (Doc. 31-3, pp. 17–18.) Plaintiff also had a direct supervisor named Sergeant Steven Wright. (Doc. 27-4, p. 9; doc. 27-3, pp. 13, 15.) The City's police department is relatively small, generally staffing three to five officers at a time. (Doc. 27-5, p. 44; doc. 31-1, p. 14.)

**B.     Job Description & Training**

As per the City's job description, officers were expected to perform "a wide range of law enforcement functions, including making arrests, issuing traffic tickets, traffic control, . . . enforc[ing] vehicle parking and operating laws, [and] us[ing] RADAR and/or LIDAR units to enforce speed laws . . . ." (Doc. 27-3, pp. 79–80; doc. 31-1, p. 9.) Plaintiff was also required to be certified through the Georgia Police Officer Standards and Training Council ("P.O.S.T.") as mandated by Georgia law. (Doc. 27-2, p. 1; doc. 31-1, pp. 3–4.)

**(1)     P.O.S.T. Certification & Arrest Authority**

Police officers must complete twenty hours of specific training each year to maintain P.O.S.T. certification. (Doc. 31-1, p. 3.) An officer who does not complete the requisite training hours by the end of any calendar year loses arrest authority on January 1 of the next calendar year. (Doc. 31-4, pp. 2–3.) If the officer still has not fulfilled the training requirements by January 31, the officer's P.O.S.T. certification is suspended and the Georgia P.O.S.T. will notify both the officer and the officer's employer. (Id.) The certification is not reinstated until the officer remedies the training deficiency, applies for a waiver, and pays a waiver fee. (Id. at pp. 3–4; doc. 27-3, pp. 12–13.) While Georgia P.O.S.T. sends notifications when certifications are suspended,

P.O.S.T. records are also available via the Georgia P.O.S.T. website. (See doc. 27-4, p. 9; doc. 27-7, pp. 15–16.) Each officer has electronic access to his or her own P.O.S.T. records. (Doc. 27-4, p. 9.) Plaintiff accessed her P.O.S.T. account at various points in 2015 and 2016, did not access it at all in 2017, and accessed it several times after January 11, 2018. (Doc. 31-4, pp. 8, 20–26.)

Agency administrators and other authority figures also have access to the online P.O.S.T. records. When an administrator views an officer's records, the generated report indicates any training deficits with red numbers and specifies what type of training the officer needs. (Doc. 31-3, p. 4.) Quarterman had online P.O.S.T. account access while he was Chief and could view the records of the City's officers. (See doc. 31-4, pp. 21–26.) Quarterman first accessed Plaintiff's P.O.S.T. records on January 11, 2016 (following her first P.O.S.T. certification suspension, discussed below) and that, thereafter, he viewed her records regularly until his termination. (Id.) Additionally, Pray obtained online P.O.S.T. access as an agency administrator on October 19, 2017. (Doc. 27-5, p. 26.) Pray accessed Plaintiff's records numerous times between October 17, 2017 and January 18, 2018. (See doc. 31-4, pp. 21–26; doc. 31-3, p. 17.)

Plaintiff lost her arrest authority and P.O.S.T. certification on two occasions. First, although she began to work for the City as an officer in February of 2015, Plaintiff did not complete her Georgia P.O.S.T. training by the end of that year. (Doc. 27-2, p. 1; doc. 31-1, pp. 4–5.) As a result, Plaintiff lost her arrest authority beginning on January 1, 2016. (Doc. 31-1, pp. 4–5; doc. 31-4, pp. 2–3.) When she still had not completed the necessary training as of February 3, 2016, Georgia P.O.S.T. issued a "suspension order" stating that Plaintiff's P.O.S.T. certification (in addition to her arrest authority) was suspended "effective immediately" due to the training deficiency. (Doc. 31-10, p. 4.) The suspension order appears to have been issued directly to Plaintiff and explicitly advises that "[d]uring the period of suspension, you are prohibited from

performing any duties requiring certification . . . ." (Id.)  Despite being suspended, Plaintiff had performed and was compensated for her duties as an officer during this period.  (Id. at pp. 5–6; doc. 27-3, pp. 11, 13–14.)  In fact, between January 1 and February 12, 2016, Plaintiff issued around fifteen traffic tickets.  (Doc. 27-3, pp. 13–14.)  According to Plaintiff, however, she did not know she had failed to complete her annual training or that she had lost her arrest authority and certification until February 11, 2016, when she was notified by either the municipal court clerk or Quarterman and Wright.  (Doc. 31-1, pp. 4–5; doc. 27-3, p. 13.)  That same day, Plaintiff completed her training, applied for a waiver, and paid the waiver fee.  (Doc. 31-1, pp. 4–5.)  Plaintiff's arrest authority and P.O.S.T. certification were reinstated when Georgia P.O.S.T. approved the training waiver on February 12, 2016.  (Id.)

Plaintiff lost her arrest authority for a second time on January 1, 2018 after she failed to complete her annual training by the end of 2017, and Georgia P.O.S.T. notified her sometime in the beginning of February that her certification was suspended.  (Doc. 31-1, pp. 33–34; doc. 31-3, p. 15.)  Although Plaintiff completed her training on January 13, (doc. 31-4, p. 4), she was not reinstated until March 1 because she did not apply and pay for a waiver until February 28.  (Doc. 31-3, p. 15.)

### (2)  RADAR/LIDAR Speed Detection Certification

As noted above, Plaintiff's job description included the operation of "RADAR and/or LIDAR units to enforce speed laws."  (Doc. 27-3, pp. 79–80; doc. 31-1, p. 9.)  While Georgia P.O.S.T. does not require officers to be RADAR or LIDAR certified, an officer must have a special speed detection certification to operate speed detection devices and enforce speed-related laws.  (Doc. 31-1, pp. 9–10; doc. 31-4, p. 4.)  Any RADAR or LIDAR certification is reflected in an officer's Georgia P.O.S.T. records.  (See, e.g., doc. 31-4, p. 91.)

Plaintiff failed the RADAR and LIDAR training course on two occasions.  (Doc. 31-1, p. 11.)  Plaintiff first took and failed the course while she was at the police academy, and the City subsequently hired her despite her lack of speed detection certification.  (Id. at pp. 11–12.)  At some point after she started working for the City, Plaintiff failed the course for a second time.  (Id.)  She was still not RADAR or LIDAR certified as of her termination date.  (See id. at p. 10.)

## II.     Events Giving Rise to This Action

On July 20, 2017, Plaintiff filed suit in this Court against the City for overtime compensation pursuant to the FLSA (at times, the "Overtime Suit").  Lee v. City of Walthourville, No. 4:17-cv-139 (S.D. Ga. July 20, 2017).  The City was served with process on September 5, 2017, id. at doc. 7, and the parties reached a settlement agreement shortly thereafter, id. at doc. 12.  Pray signed the agreement on behalf of the City and Plaintiff signed the agreement on October 16, 2017.  Id. at doc. 16-1, p. 7.  The parties filed a Joint Motion to Approve the Settlement on November 14, 2017.  Id. at doc. 16.  The Court approved the settlement agreement and dismissed Plaintiff's case with prejudice on March 19, 2018.  Id. at doc. 19.

On October 15, 2017, several days after Pray signed the agreement settling Plaintiff's lawsuit, the City sent a "notice of proposed adverse action" to Quarterman, notifying him that a three-day suspension had been proposed for his alleged failure to abide by a new overtime policy.  (Doc. 27-5, p. 108.)  Specifically, it stated that Quarterman had twice been informed that, going forward, all overtime for City employees must be pre-approved by HR Administrator Jones.  (Id.)  Nonetheless, the notice stated that "officers in [the police] department [had] continue[d] to accrue overtime at an alarming rate."  (Id.)  The notice referred specifically to Plaintiff and Sergeant Wright as examples of officers who had accrued significant overtime between September 27 and October 10, 2017, and that "[t]his is despite the fact that Officer Lee has filed a claim with the City

for a violation of the Federal Overtime Laws and it was explained to you the reason and importance of the policy." (Id.)

Almost two weeks later, the City sent Quarterman a "Proposed Letter of Reprimand" regarding two additional issues that had come to its attention. (Id. at p. 106.) One of the issues was that the City, in its review of Plaintiff's Overtime Suit, had learned that Plaintiff lacked RADAR certification and had failed the certification course twice. (Id. at p. 106.) Given that Plaintiff "often work[ed] over 100 hours in a pay period," the City "question[ed] what duties she [was] actually performing on the road." (Id.) The letter "question[ed] why" Quarterman had not brought this information to "the attention of the Mayor and Council" and ordered Quarterman to advise as to the status of Plaintiff's certifications as well as "the current training level of all the current police officers." (Id. at pp. 106–07.)

In a written response to this letter a few days later, Quarterman asserted that "[RADAR] certification is not a requirement for [Plaintiff]'s position" and "[t]here is more to police work than [RADAR] Operation."[2] (Doc. 31-19, p. 2.) Quarterman repeatedly opined that the City's focus on Plaintiff's certifications evinced retaliation and "an outlandish attempt to create infractions." (Id.) Additionally, Quarterman questioned recent interview and hiring-related decisions by the City, claiming they were not properly conducted, and asked why the City was not "questioning" other officers who were "under POST [sic] investigation." (Id.)

Following a hearing concerning the issues raised in the City's correspondence to him, Quarterman agreed to provide a training schedule for Plaintiff's RADAR and LIDAR certifications

---

[2] Additionally, Quarterman claims that he notified human resources when Plaintiff failed her RADAR certification for the second time. (Doc. 31-19, p. 2.) It is undisputed that this second failure of the course occurred prior to Jones taking over the human resources position, and there is no evidence that Pray had any knowledge prior to October 2017. Further, the information is displayed on Plaintiff's P.O.S.T. account, and it is undisputed that Pray did not access Plaintiff's P.O.S.T. records until October 19, 2017. (See Doc. 31-4, pp. 21–26; 31-3, pp. 20, 17.)

within seven days. (Doc. 27-5, pp. 28–29; doc. 31-1, p. 22.) On December 7, however, he provided a dateless training plan along with a letter explaining that he and Wright spoke with Plaintiff about her RADAR training, that "she did not feel she need[ed]" the training to "fulfill her duties," and that both he and Wright agreed with her. (Id. at pp. 2–4.) Quarterman also said Plaintiff felt that she was being targeted for filing the Overtime Suit. (Id.)

The email also included letters from Wright and Plaintiff. (See Doc. 31-7.) Wright first noted that, unlike an officer's annual training, specialized certifications like RADAR are not required by Georgia P.O.S.T. (Id. at p. 5.) He explained that it is "up to each officer to maintain their [mandatory] training" and argued it should similarly be up to the officer to determine whether they want to obtain a certain "specialized certification." (Id.) In her letter, Plaintiff explained she came forward because the City was "attempting to make [it] look as if" Quarterman had allowed her "to work overtime hours excessively without justification." (Id. at p. 6.) She opined that Quarterman "was being retaliated against for doing his job in keeping the city secure" by utilizing overtime, and that she, Quarterman, and Wright were all targets and victims of "Retaliation, Hostile work area, Discrimination and Extreme BULLYING." (Id.) The following day, Plaintiff filed a Charge of Discrimination with the EEOC pursuant to Title VII of the Civil Rights Act of 1964. (Doc. 27-7, p. 66.) Plaintiff alleged that, in November of that same year, Pray, Jones, and the City Attorney had subjected her to "harassment, intimidation, and unequal terms of employment" in retaliation for the Overtime Suit. (Id.)

On December 20, 2017, the City sent Quarterman a notice of Proposed Adverse Action, notifying him of its proposal to remove him from his position as chief. (Doc. 27-5, pp. 103–05.) The notice first stated that Quarterman failed to act in accordance with assurances he had made to the City. (Id.) According to the letter, Quarterman had admitted to knowing the City's overtime

policy and agreed to abide by it in the future, but his department continued to log unapproved overtime. (Id.) The notice also referenced other issues within the department and stated that Quarterman had not provided the agreed-upon RADAR/LIDAR training schedule.[3] (Id. at pp. 103–04.) On December 27, 2017, the City sent Quarterman an amended version of the December 20 notice. (Id. at pp. 100–02.) The amended version mirrored the original but added an allegation concerning Plaintiff's 2016 P.O.S.T. certification suspension. (Id.) Specifically, the letter said, "[d]espite the fact that you were provided written notice of [Plaintiff's] suspension on or about February 3, 2016, [she] logged 96 hours for the pay period between 2/3/16 and 2/16/16," and it emphasized that Plaintiff's having been permitted to work during this period "potentially opened up the City to liability." (Id. at p. 101.) According to the City, it sent the amended version of the letter after learning, on December 26, 2017, about the fact that Plaintiff had worked while suspended in 2016. (Doc. 27-1, pp. 7–8.)

HR Administrator Jones called Georgia P.O.S.T. sometime after December 26, 2017, seeking clarification about Plaintiff's 2016 suspension. (Doc. 32, p. 101.) On January 10, 2018, a Georgia P.O.S.T. employee sent her a letter in reference to their "recent phone conversation;" the letter provided a summary of Plaintiff's training history, noted the training deficiency that led to her 2016 suspension, and stated that, "due to a training deficiency in 2017, [Plaintiff] has no arrest authority as of January 1, 2017" and that this would remain the case until she "clears the issue with a training waiver." (Doc. 27-3, p. 34.) On January 11, 2018, the City sent Quarterman a letter terminating his employment for the reasons stated in the December 27, 2017 letter. (Doc. 27-5, pp. 97–99.)

---

[3] Relevant here, it noted that a police officer without RADAR or LIDAR certification had issued nine speeding tickets and that the City could be liable for such conduct. (Id. at p. 104.)

Meanwhile, beginning December 26, 2017, Plaintiff took time off "due to high blood pressure and work-related stress," (doc. 31-3, p. 9), and did not report for her scheduled shifts on December 29–31, 2017 (doc. 32, p. 91), January 3, (doc. 27-4, pp. 15–16, 41), January 4, or January 8, 2018 (doc. 32, p. 91). Plaintiff asserts that Sergeant Wright (her supervisor) approved her "leave request," but she neglects to provide details indicating the length or dates of the sick leave period that she claims was approved. (See doc. 31-3, p. 9.) Jones testified that she did not receive a written leave request from Plaintiff and subsequently contacted Plaintiff to ask for documentation concerning the absences. (Doc. 32, p. 91–92.; doc. 27-7, p. 21.) Plaintiff responded on January 9 with a doctor's note that covered December 28–30. (Doc. 32, p. 91; doc. 27-3, pp. 82–83.)

On January 17, Jones emailed Plaintiff and asked for a doctor's excuse covering December 31 so that Jones could finalize Plaintiff's payroll check. (Doc. 27-3, p. 84.) Attached to the email was a notice of Proposed Adverse Action dated January 12, 2018. (Id. at pp. 37–38, 84; doc. 32, p. 88.) The letter provided, in relevant part,

> [I]t has been proposed to remove you from your position . . . . On January 10, 2018, Georgia [P.O.S.T.] informed the City that you currently have no arrest authority as a police officer within the State of Georgia . . . [and] the City has no documentation where you yourself let us know of your inability to work the job for which you were hired.
>
> You have a history of being deficient with your training. Allegedly, you were without law enforcement powers from January 1, 2016 to February 12, 2016 due to a training deficiency. Despite having no law enforcement powers during this period, you continued to work, make arrests and receive pay . . . .
>
> Further, our records indicate that [you] were provided written notice of an emergency suspension from P.O.S.T. on or about February 3, 2016. Notwithstanding receiving actual notice of the suspension of your law enforcement powers, you logged 96 hours for the pay period between 2/3/16 and 2/16/16. . . . Working during this period potentially exposed the City to liability for any potentially illegal arrests or stops you may have made during this period.

> You allegedly did not inform anyone within the City of your suspension in 2016, and did not do so with the most recent suspension. We are a small city; the absence of one officer seriously hampers our ability to protect the citizens and property. We are also unable to plan and schedule officers to cover shifts without accurate, correct, and truthful knowledge of an officer's ability to perform their duties.

(Doc. 27-3, pp. 37–38.) The letter then advised Plaintiff that she had a right to respond, could offer evidence in support of any answer, and that any hearing would occur within ten days. (Id. at p. 38.) Finally, the notice stated that Plaintiff would be "retained in a work status (suspended, unpaid) until January 19, 2018." (Id.)

On January 19, Plaintiff responded to Jones' email and submitted a doctor's note for December 31. (Doc. 31-9, p. 2.) The excuse was identical to the original note covering December 28, 29, and 30, but it now also listed December 31. (Doc. 27-3, pp. 16, 85.) However, Jones noticed that the word "void" was printed all over the note, (id.; doc. 32, pp. 91–92), and she asked Plaintiff for permission to contact the medical provider for further information. (Doc. 27-3, p. 16.) Plaintiff did not respond to Jones' request, (id. at pp. 16–17), but she did send Jones an email on January 22 that addressed her medical leave and training deficiency. (Id. at pp. 86–87.) In that email, Plaintiff explained that she had "been under medical [sic] since December 26," and that while she did not finish her annual training by December 31, she had since completed the two hours she needed. (Id. at p. 87.) Later that day, the City sent Plaintiff a letter wherein Pray stated that she "decided to follow through with [her] earlier proposal" to remove Plaintiff from her position. (Id. at pp. 39–40.) In addition to the explanations provided in the January 12 notice, the letter stated,

> Finally, in an effort to explain away your [training] deficiency, you apparently altered a doctor's note . . . . We asked you to provide some form of supporting documentation to clear up the apparent altered note[], but none was forthcoming. Please note, that we did not inquire as to the nature of your condition, just the written excuse for the absence(s).

(Id. at p. 40.)

Plaintiff's termination was reported to Georgia P.O.S.T. on January 25, 2018. (Doc. 31-3, p. 17.) Her account states that she was terminated due to the "second offense of losing arrest powers." (Doc. 31-4, p. 17.) On February 7, 2018, the City submitted documentation about its decision to the Department of Labor. (Doc. 32, pp. 93–94.) The accompanying letter reiterated that Plaintiff did not complete her training for 2015 or 2017 in a timely manner, worked despite her suspension in 2016, and did not inform the City of the training issues or her suspension. (Id.; doc. 27-3, p. 29.)

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett,

477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in the light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).  However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Id. (emphasis and citations omitted).

## DISCUSSION

As noted above, Plaintiff asserts that the City violated the FLSA's anti-retaliation provision, codified at 29 U.S.C. § 215(a)(3).  (Doc. 1, p. 8.)  Section 215(a)(3) provides, in pertinent part, that "it shall be unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this [Act] . . . ."  29 U.S.C. § 215(a)(3).  To prevail on such a claim, a plaintiff must ultimately prove that "the 'immediate cause' of [her] discharge [was] retaliation."  Reich v. Davis, 50 F.3d 962, 965 (11th Cir. 1995) (citation omitted).  This can be done through either direct or circumstantial evidence.  See Morgan v. Kalka & Baer LLC, 750 F. App'x 784, 787 (11th Cir. 2018) (per curiam); E.E.O.C. v. Joe's Stone Crab, Inc.,

220 F.3d 1263, 1286 (11th Cir. 2000). Here, it is undisputed that Plaintiff does not have direct evidence of intentional discrimination. (Doc. 31-1, p. 45.)

Absent direct evidence, a plaintiff must present circumstantial evidence to prove a defendant's improper motive. This evidence "may be evaluated under the burden[-]shifting framework [first] articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973)." <u>Raspanti v. Four Amigos Travel, Inc.</u>, 266 F. App'x 820, 822 (11th Cir. 2008) (per curiam).[4] Under this model, the plaintiff bears the initial burden of establishing a prima facie case of FLSA retaliation. <u>Wolf</u>, 200 F.3d at 1343; <u>see</u> <u>Langston v. Lookout Mt. Cmty. Servs.</u>, 775 F. App'x 991, 1000 (11th Cir. 2019) (per curiam). Should a plaintiff make this showing, "the burden shifts to the employer to proffer a legitimate reason for the adverse action. If the employer offers a legitimate reason, the plaintiff must then establish that the proffered reason was pretextual." <u>Hornsby-Culpepper v. Ware</u>, 906 F.3d 1302, 1314 (11th Cir. 2018).

## I.    Plaintiff's Prima Facie Case

Upon careful review of the record and drawing all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff is unable to establish a prima facie case of retaliation. "A prima facie case of FLSA retaliation requires [the plaintiff to demonstrate] the following: '(1) she engaged in activity protected under [the FLSA]; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action.'" <u>Wolf</u>, 200 F.3d at 1342–43 (citation omitted). In its Motion, the City focuses on the third element and contends that Plaintiff fails to establish a prima facie case because she has not

---

[4] While "<u>McDonnell Douglas</u> was a Title VII case, the burden-shifting framework established therein has been adapted and applied to cases under the Age Discrimination in Employment Act . . . and the FLSA." <u>Hagan v. Echostar Satellite, L.L.C.</u>, 529 F.3d 617, 624 (5th Cir. 2008); <u>see also</u> <u>Wigfall v. Saint Leo Univ., Inc.</u>, 517 F. App'x 910, 912 n.3 (11th Cir. 2013) (per curiam) (noting that retaliation claims under several statutes utilize burden-shifting model) (citing <u>Wolf v. Coca-Cola Co.</u>, 200 F.3d 1337, 1342–43 (2000)).

shown a causal link between her protected act—the Overtime Suit—and the adverse employment action—her termination. (Doc. 27, pp. 15–17.) Plaintiff disagrees, arguing that the City's position relies on an incomplete characterization of the first two elements. Specifically, Plaintiff alleges she engaged in several protected acts *after* she filed the Overtime Suit and that this protected expression caused an ongoing series of adverse actions until her termination. (See Doc. 31, pp. 5–13.) The Court will address each element of Plaintiff's prima facie case in turn.

### A.      Protected Activity

Pursuant to the FLSA's retaliation provision, an employee engages in protected activity if she "file[s] any complaint or institute[s] or cause[s] to be instituted any proceeding under or related to this chapter, or [testifies] or is about to testify in any such proceeding . . . ." 29 U.S.C. § 215(a)(3). As noted above, it is undisputed that Plaintiff's filing of the Overtime Suit qualifies as a "protected activity" under the FLSA. (Doc. 27-1, p. 14.) However, Plaintiff contends that she engaged in two additional acts of FLSA-protected expression. (Doc. 31, pp. 5–6.)

First, Plaintiff contends that she engaged in an "ongoing" act of statutorily protected expression as an active party in the Overtime Suit because she could have been "called to testify" at any moment until the suit's dismissal in March 2018. (Id.) While the language of Section 215(a) does protect employees who testify or are "about to testify" in a proceeding, there are no facts tending to show that such circumstances were present in this case. The record is devoid of evidence indicating whether or when Plaintiff testified, expected to testify, or was asked to testify. However, the record *does* show that by October 16, 2017, Plaintiff had signed the settlement agreement and that, less than a month later, she filed a motion asking the Court to approve the settlement and dismiss the case with prejudice. (See Doc. 31, p. 6.) Said differently, no reasonable jury could find that Plaintiff was in any way "about to testify" once she signed an agreement

releasing all of her claims against the City, particularly once she asked the Court to approve the settlement and dismiss her case. Cf. Hinsdale v. City of Liberal, 19 F. App'x 749, 756 (10th Cir. 2001) (per curiam) (plaintiff engaged in protected activity in making the *decision* to testify in FLSA lawsuit). Accordingly, Plaintiff has failed to show that she engaged in ongoing protected activity up to the formal conclusion of the Overtime Suit in March 2018.

Second, Plaintiff contends the December 7 letter she submitted in relation to Quarterman's disciplinary proceedings qualifies as a protected act. (Doc. 31, pp. 5–6; see doc. 31-7.) In that letter, she accused City officials of targeting and retaliating against her, Quarterman, and Wright because she "requested what is rightly [hers]" in the Overtime Suit and because she had recently worked overtime. (Doc. 31-7, p. 6.) Written, informal complaints to an employer are generally considered protected acts where the complaint "reasonably could be perceived as directed towards the assertion of rights protected by the FLSA." McKenzie v. Renberg's Inc., 94 F.3d 1478, 1487 (10th Cir. 1996); see also EEOC v. White & Son Enters., 881 F.2d 1006, 1011 (11th Cir. 1989) ("[W]e conclude that the unofficial complaints expressed by the women to their employer about unequal pay constitute an assertion of rights protected under the statute."); Burnette v. Northside Hosp., 342 F. Supp. 2d 1128, 1133-34 (N.D. Ga. 2004) (protected activity does not require a specific FLSA reference so long as the activity or complaint concerns an employer's wage or hour practices). In other words, the complaint must be "sufficiently clear and detailed such that a reasonable employer would understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." Kasten, 563 U.S. at 14; see, e.g., White & Son Enters., 881 F.2d at 1011 (facts sufficient to find employer was on notice where boss said he would not give raise to women who had previously complained to third parties about unequal pay).

Viewing the facts in the light most favorable to Plaintiff, the December 7 letter contained enough detail to put the City on notice that Plaintiff was alleging retaliation in violation of the FLSA. See Shah v. Clark Atlanta Univ., Inc., No. CIV.A.1:97-CV3786CAM, 1999 WL 1042979, at *14 (N.D. Ga. July 20, 1999) (noting that "a complaint about retaliation for a protected activity would itself be a protected activity"). The FLSA protects employees' rights to be free from retaliation after engaging in a protected activity—like filing a lawsuit—and, in the letter, Plaintiff opined that she, among others, was being targeted for overtime work and the Overtime Suit. (Doc. 31-7, p. 6.) As the parties had signed a settlement agreement related to this request two months earlier, the City was necessarily aware of the Overtime Suit and the alleged FLSA violations therein. (Doc. 31, p. 6.) Additionally, in the letter, Plaintiff asserted her desire for the retaliation to stop. (Doc. 31-7, p. 6.) In light of this "content and context," a reasonable employer in the City's position could have understood Plaintiff's letter as "an assertion of [her FLSA] rights and a call for their protection," qualifying it as a protected activity under the FLSA. See Kasten, 563 U.S. at 14.[5]

Accordingly, Plaintiff has shown she engaged in two protected acts—filing the Overtime Suit and lodging the December 7 internal complaint—in satisfaction of the first element of a prima facie case.

---

[5] It is undisputed that Plaintiff also filed a Charge of Discrimination with the EEOC on December 8. (Doc. 31-1, p. 24.) To the extent Plaintiff intended to rely on her December 8 EEOC complaint as a distinct protected activity for purposes of her FLSA claim, this contention fails as a matter of law. That complaint was lodged with the EEOC pursuant to Title VII—not the FLSA—meaning it expressly invoked the protection of a distinct statute. (Doc. 27-7, p. 66.) Thus, the EEOC complaint could not be construed as "an assertion of rights protected by" the FLSA, let alone "a call for their protection," and it therefore does not qualify as a protected act per 29 U.S.C. § 215(a)(3). Kasten v. Saint-Gobain Performance Plastics Corp., 563 U.S. 1, 14 (2011); see Rohlehr v. Brookdale Univ. Hosp. & Med. Ctr., 390 F. Supp. 2d 207, 211 (E.D.N.Y. 2005) (informal complaint not a protected act under the FLSA where it alleged violations of section 8(a)(1) of the National Labor Relations Act).

## B. Adverse Actions

To satisfy the second element of her prima facie case, Plaintiff must show she "suffered adverse action by the employer." Wolf, 200 F.3d at 1343. However, "not just any adverse action will do; to be adverse, an action taken by an employer must be material." Smith v. Haynes & Haynes P.C., 940 F.3d 635, 648 (11th Cir. 2019). To show materiality, a plaintiff must demonstrate that the employer's conduct caused an injury or harm that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id. (quoting Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 57 (2006)) (internal quotation marks omitted).[6] The "standard for judging harm [is] objective," and the Court must consider the "reaction of a reasonable employee" faced with the same circumstances. Burlington, 548 U.S. at 67–68 (objectivity is necessary "to avoid the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings").

It is undisputed that Plaintiff's termination qualifies as a materially adverse employment action.[7] (Doc. 27-1, p. 14.) However, Plaintiff also alleges that the City's disciplinary proceedings against *Quarterman* qualify as a series of adverse actions against *her*. (Doc. 31, pp. 7–10.) While "employers' adverse actions against third parties may . . . qualify as actionable retaliation" against a plaintiff, the plaintiff still must demonstrate that the action was materially adverse. Smith, 940 F.3d at 64 (citation omitted); see also Thompson v. N. Am. Stainless, LP, 562 U.S. 170, 175 (2011)

---

[6] In Smith, an FLSA case, the Eleventh Circuit Court of Appeals relied on language from cases arising under Title VII and explained that "courts have often relied on Title VII retaliation cases when assessing whether conduct constitutes adverse action under the FLSA." 940 F.3d at 649 n.6. Accordingly, the Court will do the same in its analysis of Plaintiff's claim.

[7] Plaintiff also contends her unpaid suspension (beginning January 12, 2018) is a distinct adverse action. (Doc. 31, p. 10.) However, even if the suspension were to be considered a discrete adverse act, the analysis contained herein regarding Plaintiff's termination applies with equal force to her suspension.

(explaining that "firing a close family member will almost always meet the Burlington standard," but "inflicting a milder reprisal on a mere acquaintance will almost never do so").  Viewed in the light most favorable to Plaintiff, the City's actions against Quarterman: began with the October 15, 2017 "notice of proposed adverse action" due to Quarterman's failure to comply with City policy requiring preapproval for employees' (including Plaintiff's) overtime work; continued with the October 27, 2017 "proposed letter of reprimand" which raised concerns with and sought more information regarding, *inter alia*, Plaintiff's lack of RADAR certification; and ended with Quarterman's termination in January 2018 for these and other alleged shortcomings.  (Doc. 27-5, pp. 97–109.)  Plaintiff argues that, when considered alongside her December 7 letter accusing the City of retaliating against her and Quarterman, as well as the "high blood pressure and work-related stress" she endured "as a result of the [alleged] retaliation," these proceedings against Quarterman prove she endured materially adverse "scrutiny" after she filed the Overtime Suit.[8]  (Doc. 31, pp. 7–10.)  The Court disagrees.

First, "the fact that an employee continues to be undeterred in his or her pursuit of a remedy[] . . . may shed light as to whether the actions are sufficiently material and adverse to be actionable."  Burgos v. Napolitano, 330 F. App'x 187, 190 (11th Cir. 2009) (per curiam) (quoting Somoza v. Univ. of Denver, 513 F.3d 1206, 1214 (10th Cir. 2008)) (holding that employer's action was not a "materially adverse" one based in part on the fact that "the evidence shows that [the plaintiff] was not deterred in reinstating her EEOC claim").  Here, Plaintiff sent the letter accusing

---

[8]  As described in the preceding subsection, Plaintiff has presented two actionable instances of "protected activity" for purposes of surviving summary judgment: the Overtime Suit and her December 7 letter.  The Court notes that Plaintiff cannot logically argue that the alleged scrutiny and pressure on Quarterman was an adverse action that she suffered subsequent to sending the December 7 letter.  It is undisputed that Quarterman's disciplinary proceedings began in October 2017—two months prior to Plaintiff's December 7 letter; indeed, Plaintiff points to the letter itself as proof that the scrutiny was occurring in the first place. (Doc. 31, p. 10.)

the City of retaliating against her on December 7 and she filed the retaliation complaint with the EEOC the next day, both *after* the City had sent its discipline-related notices to Quarterman concerning, *inter alia*, Plaintiff's accrual of overtime and her lack of RADAR certification.  (Doc. 31, p. 10; doc. 31-1, p. 24; doc. 27-5, pp. 106–109.)  The fact that Plaintiff actively and repeatedly complained about the City's conduct demonstrates that she, in fact, was not dissuaded by the City's disciplinary proceedings against Quarterman.  See Burgos, 330 F. App'x at 191; Smith v. Haynes & Haynes, P.C., No. 2:14-CV-01334-RDP, 2017 WL 3613045, at *8 (N.D. Ala. Aug. 22, 2017) (suspension of plaintiff's lawyer not adverse action where plaintiff "continued to prosecute" after suspension), aff'd, 940 F.3d 635.

Moreover, Plaintiff has not shown that the City's concern about her unauthorized overtime hours or its inquiry into her RADAR certification "produce[d] an injury or harm" serious enough to be considered "materially adverse."  Burlington, 548 U.S. at 67–68; see Crawford v. Carroll, 529 F.3d 961, 973 (11th Cir. 2008).  Nothing in the record shows that these issues impacted her job or job status in any way; there is no evidence that the City (or Quarterman) threatened Plaintiff's job security, decreased her regular hours, reduced her wage, demoted her, or otherwise altered the status quo.  While Plaintiff points to her medical ailments to establish the impact of the City's inquiries, her subjective reaction, by itself, does not demonstrate "why a reasonable worker in h[er] shoes would have been dissuaded from reporting allegedly retaliatory conduct."  Johnson v. Miami-Dade Cty., 948 F.3d 1318, 1327 (11th Cir. 2020).  Said differently, there is "no evidence that [Plaintiff] suffered harm from any action that would have deterred a reasonable employee from making or supporting a charge of discrimination."  Barnett v. Athens Reg'l Med. Ctr., 550 F. App'x 711, 715 (11th Cir. 2013) (per curiam); see Smith, 2017 WL 3613045, at *8 (physical manifestations of stress from lawyer's suspension insufficient to elevate suspension to a statutorily

adverse action); Clemmons v. Columbus Consol. Gov't, No. 4:15-CV-54 (CDL), 2016 WL 6892086, at *12 (M.D. Ga. Nov. 22, 2016) (no evidence that "additional training amounted to an adverse employment action or a materially adverse action"); Rollins v. Ala. Cmty. Coll. Sys., 814 F. Supp. 2d 1250, 1306 (M.D. Ala. 2011) (finding the record lacked evidence that being required to attend additional training was sufficiently adverse even if dispute of fact existed as to defendant's motivation). Accordingly, the alleged "increased scrutiny" (via Quarterman's disciplinary proceedings) cannot provide an additional basis to satisfy this element.

## C.    Causal Connection

In its Motion, the City argues Plaintiff's prima facie case fails because she cannot establish a causal connection between any of its actions and her termination. (Doc. 27-1, pp. 14–17.) Specifically, the City argues that Plaintiff failed to establish the element of causation because an intervening act of misconduct—her loss of arrest powers for the second time—severed any causal connection. (Doc. 27-1, pp. 16–17.) The Court agrees.

To establish causation, a plaintiff must show that "the adverse action would not have been taken 'but for' the assertion of FLSA rights."[9] Wolf, 200 F.3d at 1343 (quoting Reich, 50 F.3d at

---

[9] It has been established for quite some time in this Circuit that "but-for" causation is the proper terminology applicable to FLSA retaliation cases. See Reich, 50 F.3d at 965-66 (11th Cir. 1995) (applying "but for" causation standard in FLSA retaliation case but equating standard to the "motivating factor" test). It is unclear, however, whether the Supreme Court's decision in University of Texas Southwestern Medical Center v. Nassar, 570 U.S. 338 (2013), alters the way the "but-for" standard is to be applied. In Nassar, the Supreme Court grappled with the proper causation standard for retaliation claims under Title VII. 570 U.S. at 348–52. After distinguishing "motivating factor" causation as a "lessened causation standard," the Court concluded that Title VII retaliation claims require proof of "but-for" causation because (1) Title VII's anti-retaliation provision prohibits taking an adverse employment action "because" of certain criteria; (2) in Gross v. FBL Financial Services, Inc., 557 U.S. 167 (2009), the Court interpreted the same language in the ADEA, 29 U.S.C. § 623(a), as requiring proof of but-for causation; and (3) there was no "meaningful textual difference" between those two statutes. 570 U.S. at 348–52.

While the Eleventh Circuit Court of Appeals recently applied Gross and Nassar's "but-for" standard to the False Claims Act's retaliation provision (31 U.S.C. § 3730(h)(1)), see Nesbitt v. Candler County, Ga., 945 F.3d 1355, 1359–60 (11th Cir. 2020), no binding precedent has extended it to the FLSA. Nonetheless,

965–66).  A "'but-for' cause requires a closer link than mere proximate causation; it requires that the proscribed animus have a determinative influence on the employer's adverse decision."  <u>Sims v. MVM, Inc.</u>, 704 F.3d 1327, 1335–36 (11th Cir. 2013).  However, even where there is evidence of causation, "[i]ntervening acts of misconduct can break any causal link between the protected conduct and the adverse employment action."  <u>Henderson v. FedEx Express</u>, 442 F. App'x 502, 506 (11th Cir. 2011) (falsification of time card was an intervening act of misconduct) (citing <u>Kiel v. Select Artificials, Inc.</u>, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc)); <u>see also</u> <u>Hankins v. AirTran Airways, Inc.</u>, 237 F. App'x 513, 520-21 (11th Cir. 2007) (plaintiff's violation of handbook after discrimination complaint severed any causal connection between protected act and termination).

In this case, Plaintiff cannot establish the requisite causal link between any protected activity and her termination because at least one intervening act of misconduct supported the City's decision to terminate her employment.  It is undisputed that annual P.O.S.T. training and certification is required of all officers and that Plaintiff did not complete the requisite amount of training hours by the end of the year in both 2015 and 2017.  Plaintiff admits that she was aware of her annual P.O.S.T. training requirement; indeed, she completed several hours of training just a

---

lower courts have done so, noting that, like Title VII, the ADEA, and the False Claims Act, the FLSA's retaliation statute, 29 U.S.C. § 215(a)(3), prohibits an employer from terminating or discriminating against an employee "because" such employee engaged in protected activity.  See <u>Moakler v. Furkids, Inc.</u>, 374 F. Supp. 3d 1306, 1318 n.4 (N.D. Ga. 2019); <u>Kubiak v. S.W. Cowboy, Inc.</u>, 164 F. Supp. 3d 1344, 1365 n.30 (M.D. Fla. 2016); <u>see also</u> <u>Miller v. Metrocare Servs.</u>, No. 3:13-CV-1984-D, 2015 WL 477233, at *5 (N.D. Tex. Feb. 5, 2015); <u>Mould v. NJG Food Serv., Inc.</u>, 37 F. Supp. 3d 762, 778 n.11 (D. Md. 2014).  However, other courts have declined to do so, citing the dearth of Eleventh Circuit precedent on the issue.  See <u>Smith v. Metro Mech., Inc.</u>, No. 2:16-CV-1107-KOB, 2018 WL 1064410, at *6 (N.D. Ala. Feb. 27, 2018).

Here, the City argues that <u>Nassar</u> applies to Plaintiff's claims, (doc. 34, p. 3), and in her Response, Plaintiff states that she "assume[s] for purposes of [her] brief" that this "but-for" standard applies to the present action, (doc. 31, p. 11).  Based on the parties' agreement and the Eleventh Circuit's holding in <u>Nesbitt</u>, the Court will do the same.  However, even if a lesser standard applies and Plaintiff could establish a prima facie case, her claim would nonetheless fail for the reasons set forth below.

few weeks prior to her termination. (Doc. 31-3, p. 8.) The City terminated Plaintiff after learning that she had lost arrest authority—for the second time in three years—due to her failure to meet the training requirements for the preceding year. (Doc. 27-3, pp. 39–40.)

While Plaintiff attempts to neutralize this evidence by emphasizing that she was not disciplined the *first* time she failed to meet the training requirements, she does not present any evidence that the City ever retained another officer who had lost this authority on more than one occasion. See Fleming v. Boeing Co., 120 F.3d 242, 248 (11th Cir. 1997) (no causation where plaintiff failed required test and there was no evidence that defendant company ever hired someone who had not passed); see also Boone v. City of McDonough, No. 1:12-CV-1036-WSD, 2013 WL 4670480, at *23 (N.D. Ga. Aug. 29, 2013), aff'd, 571 F. App'x 746 (11th Cir. 2014) (intervening act of misconduct severed causation where plaintiff had second episode of behavioral problems even though he was not disciplined for the first instance). Thus, the Court finds that the adverse action (Plaintiff's termination) was caused by Plaintiff's own intervening act of misconduct (training deficiencies and resulting suspension of arrest authority), meaning no causal connection exists between the protected acts (the Overtime Suit and the December 7 letter) and the adverse action. See Brisk v. Shoreline Found., Inc., 645 F. App'x 415, 417 (11th Cir. 2016) (per curiam) ("[T]here is no causal connection between a protected act and an adverse action, where the adverse action was caused by intervening act of misconduct.") (citing Fleming, 120 F.3d at 248). Accordingly, Plaintiff has failed to establish a causal connection between her termination and any protected activity and therefore cannot fulfill her burden to establish a prima facie case for FLSA retaliation; as such, the City is entitled to summary judgment on all claims asserted against it.

## II.    Pretext

For the reasons explained above, Plaintiff has failed to establish a prima facie case of retaliation and the City is entitled to judgment in its favor.  However, even if Plaintiff had met this burden, the City would still be entitled to summary judgment because Plaintiff cannot show the City's legitimate, nonretaliatory reasons for Plaintiff's termination were merely pretext.  See Wolf, 200 F.3d at 1343.  "An employer's burden to articulate a non-discriminatory reason for [an adverse employment action] is a burden of production, not of persuasion."  Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 769 (11th Cir. 2005).  This burden "involves no credibility determination" and only requires the employer to state "'a clear and reasonably specific' non-discriminatory basis for its actions."  Id. at 769–70 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254–55 (1981)).  Here, the City's stated reasons for Plaintiff's termination—losing her arrest authority for the second time and failing to alert her employer—satisfy this "exceedingly light" burden.  See id. at 770; Smith v. Horner, 839 F.2d 1530, 1537 (11th Cir. 1988) (describing employer's burden at this stage as "exceedingly light"); see also Chapman v. AI Transp., 229 F.3d 1012, 1031 (11th Cir. 2000) (burden met where stated reason may motivate a reasonable employer).

At this point, the burden shifts back to Plaintiff to produce evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  Id. at 1024 (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997)).  "[A] reason cannot be proved to be [pretextual] unless it is shown *both* that the reason was false, *and* that [a prohibited criterion] was the real reason."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515-16 (1993) (quotation omitted).  A plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is

unworthy of credence." <u>Jackson v. Ala. State Tenure Comm'n</u>, 405 F.3d 1276, 1289 (11th Cir. 2005); <u>see also</u> <u>Combs</u>, 106 F.3d at 1538 (The court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered [nonretaliatory] reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'") (citation omitted). However, an employee is "not allowed to recast an employer's proffered [nonretaliatory] reasons or substitute his business judgment for that of the employer." <u>Chapman</u>, 229 F.3d at 1030. Rather, "an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." <u>Id.</u>

Here, Plaintiff fails to offer evidence that rebuts the City's stated reasons for her termination. (<u>See</u> Doc. 31.) Plaintiff first attempts to show pretext by arguing that the City knew she had not completed her training prior to the end of 2017 and, rather than informing Plaintiff of her deficiency, it "set her up" to fail. (<u>Id.</u> at pp. 19–20.) In support of this contention, Plaintiff points to various times that Pray accessed her P.O.S.T. records starting in October 2017 and argues this "surveillance" indicates that the City did not take action "because [it] was waiting for a legal, legitimate reason to fortuitously materialize into an opportunity to fire [Plaintiff]." (<u>Id.</u> at pp. 18–20.) As an initial matter, there is no evidence in the record that the decisionmaker—Pray—had a duty to inform Plaintiff. Moreover, Plaintiff testified that she was aware of the annual training requirements and it is undisputed that she completed several hours of training in December of 2017. (Doc. 34, p. 8.) It is similarly undisputed that Plaintiff had access to her P.O.S.T. account and could view her hours at any time, yet nothing in the record indicates that Plaintiff accessed her P.O.S.T. account *at any point* during 2017. (<u>See</u> Doc. 31-4, pp. 23–26.) Indeed, like her failure to complete her training in 2015, Plaintiff neglected to finish her P.O.S.T. training until after she

received notice of the deficiency, and the City argues it ultimately terminated her on that basis; even if the City was aware of Plaintiff's training deficiency before January 1, 2018, this knowledge does not render its explanation "unworthy of credence." Jackson, 405 F.3d at 1289.

Plaintiff also stresses the lack of disciplinary action in response to her 2016 suspension (for the 2015 training deficiency), arguing that the decision to take formal action in 2018 for the same behavior tends to show that the City's reasoning is pretextual. (Doc. 31, pp. 17–18.) Plaintiff further contends that "[p]unishment for old crimes is textbook pretext." (Id. at p. 17.) In its Reply, the City argues that neither of these assertions meets its stated termination grounds "head on." (Doc. 34, pp. 6–7.) Indeed, the undisputed record shows that the City's proffered reason for terminating Plaintiff was her *repeated* failure to properly maintain her certifications. (See Doc. 27-3, pp. 37–38.) The City does not allege that Plaintiff's termination was based solely on the 2018 suspension and, in fact, admits that the "old crime" (the 2016 suspension) was a consideration in its decision (because, without it, there would be no pattern). Thus, Plaintiff's assertions do not indicate that the proffered termination basis was false—much less that retaliation was the real reason.

Additionally, Plaintiff alleges that the City departed from its written policies in several different ways and that these deviations are evidence of pretext. (Doc. 31, pp. 21–24.) First, Plaintiff argues that the City deviated from its "progressive disciplinary policy" by not implementing a lesser employment action, and that the severity of her punishment was particularly egregious in light of her explanation that she could not complete her hours due to medical issues. (Id.) It is true that "an employer's deviation from its own standard procedures may serve as evidence of pretext." Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1299 (11th Cir. 2006). However, the Manual states that the City "may depart from progressive discipline and

skip any step or steps of the disciplinary process after investigation and analysis of the situation and circumstances" and, "based on the severity of the misconduct, . . . [may] immediately discharge any employee." (Doc. 31-11, pp. 10, 12.) The record shows that the City did investigate Plaintiff's previous P.O.S.T. suspension, that it confirmed she did not complete her hours for 2017, and that Plaintiff indeed failed to timely complete her training in both 2015 and 2017 and inform anyone of either deficiency.[10] (Doc. 27-3, pp. 11, 13.)

Plaintiff also notes that, contrary to its policy, the City "never [gave her] notice through an amended [notice of] proposed adverse action that she was being accused of altering a doctor's note and would be terminated for it." (Doc. 31, pp. 23–24.) Even assuming this was a deviation from its policy, the City's departure is immaterial because the original notice contained sufficient grounds for proposing Plaintiff's termination. Cf. Hurlbert, 439 F.3d at 1299 (failure to send plaintiff notice of termination in accordance with policy could show pretext where defendant did not provide basis for plaintiff's termination until after decision was made). Moreover, an employer's provision of supplementary reasons for an employee's termination can only serve as evidence of pretext where the additional bases are inconsistent with the employer's initial reasoning. See Fane v. Locke Reynolds, LLP, 480 F.3d 534, 541 (7th Cir. 2007) ("[Defendant] could have relied on all three reasons simultaneously, regardless of whether it emphasized one over the others at a given time."); Johnson v. Nordstrom, Inc., 260 F.3d 727, 733–34 (7th Cir. 2001) (pretext not shown where employer simply supplemented its explanations and did not retract any of its reasons for failing to promote the plaintiff); Tidwell v. Carter Products, 135 F.3d 1422, 1428 (11th Cir. 1998) (existence of a possible additional non-discriminatory basis for plaintiff's

---

[10]  While it is certainly unfortunate that Plaintiff endured a medical issue beginning on December 26, 2017—less than a week before the training requirement deadline—she had more than 11 months and three weeks (prior to her illness) to complete the training, and there is no evidence that she took proactive steps to notify and seek leniency from the City or Georgia P.O.S.T. regarding her inability to complete the hours.

termination does not prove pretext). The City consistently cited Plaintiff's loss of arrest authority and corresponding training deficiencies as bases for her termination, and its provision of an additional reason—the alleged fabrication of the doctor's note—does not contradict or otherwise undermine its initial justification. See Sapp v. United States AG, 676 F. App'x 878, 883 (11th Cir. 2017) (provision of "different or alternate reason" did not show pretext where defendant's original reason for denying overtime was consistent).

While Plaintiff may believe her conduct did not merit termination, federal employment discrimination law "does not take away an employer's right to interpret its rules [and policies] as it chooses, and to make determinations as it sees fit under those rules [and policies]." Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999) (quoting Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1311 (11th Cir. 1998)); see Fane v. Locke Reynolds, LLP, 480 F.3d 534, 541 (7th Cir. 2007) (no evidence of pretext where employer's progressive disciplinary policy stated that employer reserved right to deviate from terms). In sum, Plaintiff's arguments surrounding her termination do nothing more than "quarrel[] with the wisdom of [the City's] reason[s]," and fail to "meet the reason[s] head on and rebut [them]." Chapman, 229 F.3d at 1030. As the Eleventh Circuit has "repeatedly and emphatically held, . . . employers are free to fire their employees for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as [their] action is not for a discriminatory [or retaliatory] reason." Flowers v. Troup Cty. Sch. Dist., 803 F.3d 1327, 1338 (11th Cir. 2015) (internal citations and quotation marks omitted).

The burden of persuasion rests with Plaintiff; thus, even assuming Plaintiff could establish a prima facie case, she still fails to meet her burden to show that the City's proffered reason for

her discharge was pretext for retaliation. Accordingly, the Court **GRANTS** the City's Motion for Summary Judgment as to Plaintiff's FLSA retaliation claim.[11] (Doc. 27.)

## CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendant the City of Walthourville's Motion for Summary Judgment, (doc. 27.) The Court **DIRECTS** the Clerk of Court to enter summary judgment in favor of the City and to **CLOSE** this case.

**SO ORDERED**, this 24th day of February, 2020.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[11] In her Response, Plaintiff argues that she does not need to establish a prima facie case because she presents a "convincing mosaic of circumstantial evidence" that the City's reason for her termination was pretextual. (Doc. 31, pp. 2–4.) Plaintiff correctly notes that, according to the Eleventh Circuit, the McDonnell Douglas framework "is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). A plaintiff can survive summary judgment if the record, viewed in the light most favorable to her, "demonstrate[s] a 'convincing mosaic' of circumstantial evidence that warrants an inference" of retaliation. Lewis v. City of Union City, 918 F.3d 1213, 1220 n.6 (11th Cir. 2019) (en banc); see also Calvert v. Doe, 648 F. App'x 925, 929 (11th. Cir. 2016) (per curiam) (applying the "convincing mosaic" theory in a Title VII retaliation claim). Ultimately, retaliatory intent is the crux of the matter, and "[w]hatever form it takes, if the circumstantial evidence is sufficient to raise 'a reasonable inference that the employer [retaliated] against the plaintiff, summary judgment is improper.'" Chapter 7 Trustee v. Gate Gourmet, Inc., 683 F.3d 1249, 1256 (11th Cir. 2012) (citing Lockheed–Martin, 644 F.3d at 1328). Here, Plaintiff has simply not presented circumstantial evidence that could lead a jury to conclude that the real reason for her termination was retaliation for her protected activity. Importantly, as explained above, Plaintiff has not raised a genuine dispute of fact as to whether the proffered grounds for her termination were pretextual, and for those same reasons Plaintiff cannot survive summary judgment under the "convincing mosaic" standard. See Hutchinson v. Sec'y, Dep't of Veterans Affairs, 766 F. App'x 883, 889 (11th Cir. 2019) (rejecting plaintiff's "convincing mosaic" arguments where plaintiff merely reiterated same arguments she made to show pretext and court had already concluded that circumstantial evidence failed to show discrimination in hiring decision); Mojica v. Fla. Dep't of Revenue, 704 F. App'x 834, 837 (11th Cir. 2017) (per curiam) (holding that just as evidence was insufficient to demonstrate pretext as to proffered reasons for not considering or selecting plaintiff for positions, evidence also did not give rise to inference that plaintiff was not considered or selected based on discriminatory or retaliatory reasons); Beckles v. Fed. Exp. Corp., 489 F. App'x 380, 384 (11th Cir. 2012) (per curiam) (rejecting plaintiff's "convincing mosaic" argument because plaintiff's circumstantial evidence provided no basis to show pretext as to proffered reasons for his termination).